IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIEL LAUGHLIN, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 10-213 E |
| vs. | ) | |
| | ) | Magistrate Judge Maureen P. Kelly |
| MS. PECK, DAVID SMITH, KIRK | ) | |
| HENDERSON, ROD SHOWER, EMEKA | ) | |
| IBEMERE, SUSAN SENCHAK, SHANNON | ) | |
| RANDALL, VALERIE HIEBNER, DOUG | ) | |
| PETROFF, CO WEST, LT ARYERS, | ) | Re: ECF No. 44 |
| HARLOW, and LT. YOMAN, | ) | |
| Defendants. | ) | |

## OPINION

**KELLY, Magistrate Judge**

Plaintiff Daniel Laughlin ("Plaintiff") is an inmate in the custody of the Pennsylvania

Department of Corrections ("DOC") and is currently incarcerated at the State Correctional

Institution at Mercer ("SCI Mercer"). Plaintiff filed this civil rights action against, *inter alia*,

Defendants Emeka Ibemere ("Ibemere"), Susan Senchak ("Senchak"), Shannon Randall

("Randall"), Valerie Hiebner ("Hiebner"), and Lt. Ayers ("Ayers")[1] (collectively, "the

Corrections Defendants"), alleging that they failed to protect him in violation of federal law after

he provided testimony against a former cellmate relative to a child sexual assault case.

Presently before the Court is a Motion for Summary Judgment ("the Motion") submitted

on behalf of the Corrections Defendants. [ECF No. 44]. For the reasons that follow, the Motion

will be granted.

---

[1] It appears that Defendant Ayers' name was misspelled as "Aryers" in the Complaint and, thus, in the caption of the case. The Court will nevertheless use the correct spelling. See [ECF No. 4: p. 1; ECF No. 47-2: p. 2].

## I. FACTUAL AND PROCEDURAL BACKGROUND

The evidence of record shows that Plaintiff was housed at the State Correctional Institution at Albion ("SCI Albion") from approximately November 13, 2006, until March 9, 2009, when he was transferred to SCI Mercer. [ECF No. 47-1: pp. 2-3, 5]. While at SCI Albion, Plaintiff was celled from December 10, 2007, until January 16, 2008, in A-Pod on C-Block ("C/A Unit") with inmate Rodney William Comer ("Comer"). [ECF No. 47-1: pp. 3, 8].

At some point during that time, Plaintiff sent a letter to the Office of the District Attorney of Cumberland County, Pennsylvania, indicating that he had information concerning criminal activity involving Comer. [ECF No. 4: p. 4]. On or about January 7, 2008, Defendant Randall, one of the counselors on C/A Unit, received a message from the Superintendent's Office requesting that she facilitate a telephone call between Plaintiff and the Cumberland County District Attorney's Office so that the prosecutor could ascertain whether Plaintiff could provide credible information against Comer. [ECF No. 47-1: p. 39, ¶¶ 3, 4]. During the call, Plaintiff informed the prosecutor that Comer had "told [him] all about what [Comer] did to the little girl," and agreed to testify against Comer. [ECF No. 4: p. 4, ¶ 3].

On or about January 16, 2008, Plaintiff, along with Comer and another inmate, was transported to Cumberland County to speak with the prosecutor about Comer. [ECF Nos. 4: p. 4, ¶¶ 5-7; ECF No. 47-1: p. 5]. Comer was returned to SCI Albion on January 30, 2008, and was assigned to J- Block which served as the Intake Block for inmates transferring into SCI Albion. [ECF No. 47-1: p. 8; p. 39, ¶ 7; p. 43, ¶ 3]. Thereafter, Defendant Randall contacted the Cumberland County prosecutor to inquire about Plaintiff and was told that the prosecutor had advised the County not to return Plaintiff to SCI Albion until a separation from Comer could be

worked out. Randall subsequently reported that information to Rod Showers, the Unit Manager for J-Block. [ECF No. 47-1: pp. 39-40, ¶ 7].

Plaintiff was returned to SCI Albion on February 7, 2008, and initially assigned to J-Block as well. [ECF No. 47-1: p. 3; p. 43, ¶ 4; p. 47, ¶ 5]. On that date, Plaintiff contacted Doug Petroff, who was assigned to J-Block as a counselor, and advised Petroff that Plaintiff had or would be testifying against Comer, who was still assigned to J-Block at that time. [ECF No. 47-1: p. 47, ¶ 5; p. 43, ¶ 4]. See [ECF No. 4: p. 5, ¶¶ 9-11]. Petroff directed Plaintiff to speak with Showers who apparently contacted the Security Office to confirm this information. [ECF No. 47-1: p. 43, ¶ 5; p. 47, ¶ 6]. As a result, Plaintiff was reassigned that same day to C-Block, B-Pod ("C/B Unit") and Comer was reassigned to the Restricted Housing Unit ("RHU"), which was located in H-Block. [ECF No. 47-1: p. 3; p. 8; p. 43, ¶ 6; p. 47, ¶ 7].

Comer was again transferred to Cumberland County on or about March 12, 2008, to await trial. Although he was briefly returned to SCI Albion for approximately two weeks in June of 2008, Comer was permanently transferred to the State Correctional Institution at Cresson thereafter. [ECF No. 47-1: pp. 8-9].

Plaintiff was transferred to Cumberland County on July 10, 2008, to testify against Comer. Plaintiff was transferred back to SCI Albion on July 21, 2008, and returned to C/B Unit. [ECF No. 47-1: pp. 3, 5].

The record also shows that Defendant Ibemere was the counselor assigned to C/B Unit until approximately July 14, 2008, when he was reassigned to another block. [ECF No. 47-1: p. 51, ¶¶ 4-6]. Ibemere was replaced by Defendant Hiebner on that same date. [ECF No. 47-1: p. 55, ¶ 3]. Although Hiebner had no contact or interaction with Plaintiff prior to July 14, 2008, she was nevertheless aware that Plaintiff had testified against Comer. [Id. at ¶ 4].

Plaintiff has alleged in the Complaint that between February 10, 2008, when he first returned from Cumberland County, until August of 2008, he was repeatedly subjected to physical assaults by other inmates as a result of agreeing to testify against Comer. Plaintiff also alleges that in addition to being physically assaulted, which included being pushed, slapped, kicked, punched, elbowed and tripped, he also received a series of "snitch letters" during the same time frame and was subsequently sexually assaulted in his cell on September 13, 2008, September 27, 2008, and again on October 18, 2008. [ECF No. 4: pp. 6-16, ¶¶17, 19, 20-21, 23, 25-28, 31-35, 36, 42, 44, 46-47, 51, 53, 54, 56-58, 60-63, 65, 78-83, 85-87, 91, 99, 105].

On or about October 23, 2008, Plaintiff's wife, Karen Laughlin, contacted the staff at SCI Albion and informed them that she had received a threatening letter, apparently in reference to Plaintiff's testimony against Comer. [ECF No. 47-2: p. 45; ECF No. 4: p. 16, ¶ 108]. Consequently, on that same date, Plaintiff was placed in the RHU in Administrative Custody. [ECF No. 47-1: p. 3; ECF No. 4: pp. 16-17]. Notwithstanding Plaintiff's present allegations, during his in-processing for admission to the RHU, Plaintiff was specifically asked if he had been physically or sexually assaulted by another inmate, to which Plaintiff replied "No." [ECF No. 47-1: p. 11; ECF No. 47-2: pp. 3-4, ¶ 7].

Once Plaintiff was placed in the RHU, Defendant Hiebner became involved in securing a transfer for Plaintiff. Plaintiff was eventually transferred to SCI Mercer on or about March 9, 2009. [ECF No. 47-1: pp. 3, 5, 55]. It is undisputed that during his in-processing for admission to the RHU at SCI Mercer, Plaintiff was again asked if he had been physically or sexually assaulted by another inmate; Plaintiff once again replied in the negative. [ECF No. 47-2: p. 4, ¶ 8]. On that same date, Plaintiff also met with a psychologist at SCI Mercer for an Initial Reception Mental Health Screening. The psychologist explicitly asked Plaintiff if he had "ever

been sexually assaulted during a period of incarceration," to which Plaintiff again replied "No." [ECF No. 47-1: p. 29]. A few weeks later, on March 25, 2009, Plaintiff met with Psychologist Services Specialist Stephen Laufer ("Laufer") at SCI Mercer for another Initial Reception Mental Health Screening. [ECF No. 47-1: p. 31]. Plaintiff was again asked if he had "ever been sexually assaulted during a period of incarceration," and again replied "No." [Id.]

At Plaintiff's request, he was seen again by Laufer on April 3, 2009, "to report an incident of sexual assault." [ECF No. 47-2: p. 34]. It was at that time that Plaintiff informed Laufer that he had been sexually assaulted three times while he was incarcerated at SCI Albion. [Id.]

On or about April 6, 2009, Defendant Ayers received information that Plaintiff's wife had contacted the DOC's Sexual Assault Reporting Line. [ECF No. 47-2: p. 3, ¶¶ 4-5].[2] The Sexual Assault Reporting Line Reporting Form documenting the contact indicates that Mrs. Laughlin stated that the victim was forced to perform oral sex on another inmate and had been physically assaulted by other inmates. [ECF No. 47-2: p. 14]. Mrs. Laughlin also indicated that the perpetrator's name was "not known;" that the incident(s) at issue did not occur with the past 72 hours; and that Plaintiff and his spouse were seeking assistance from the "Institutional Law Project." [Id.]

After Defendant Ayers received the Sexual Assault Reporting Line Reporting Form, he was contacted by the Security Office at SCI Albion, which had received the same report. [ECF No. 47-2: p. 10]. Ayers was informed by the Security Office that Plaintiff had been placed in the RHU at SCI Albion on October 23, 2008; that Plaintiff was in Administrative Custody status;

---

[2] Defendant Ayers' Declaration originally submitted in support of the Motion for Summary Judgment was unsigned. [ECF No. 47-2: p. 8]. A properly signed copy was subsequently filed on July 19, 2012, at ECF No. 51. Although unsigned, for ease of reference, the Court will refer to the original Declaration submitted with the Corrections Defendants' other exhibits.

that a video of Plaintiff's in processing into the RHU at SCI Albion on October 23, 2008, reflects that Plaintiff responded "No" when asked if he had been sexually assaulted; that Plaintiff did not report any incidents of sexual assault while at SCI Albion; that Plaintiff did report that his wife had received a threatening letter; and that Plaintiff's report was the basis for his transfer to the RHU on October 23, 2008. [ECF No. 47-2: pp. 3-4, ¶ 7].

Defendant Ayers then conducted his own investigation, first retrieving the video of Plaintiff's in processing into the RHU at SCI Mercer on March 9, 2009, which reflected that Plaintiff had also responded "No" when asked if he had been sexually assaulted. [ECF No. 47-2: p. 4, ¶ 8]. Ayers also interviewed Plaintiff and obtained a written statement from him. [Id. at ¶ 9; ECF No. 47-2: pp. 10-30]. Based on Plaintiff's statements made during the interview, Ayers contacted Laufer and asked him to prepare a written statement regarding his meeting with Plaintiff on April 3, 2008. [ECF No. 47-2: p. 4, ¶ 10; p. 34]. Ayers also requested that the "Search Team" monitor and review telephone conversations between Plaintiff and Mrs. Laughlin. [ECF No. 47-2: p. 4, ¶ 11; pp. 12, 13].

Ayers subsequently prepared a report of his investigation and directed it to Michael Harlow, the Superintendent at SCI Mercer. [ECF No. 47-2: pp. 4-5, ¶ 12; pp. 10-16]. The report, dated April 9, 2009, summarizes the steps Ayers took in his investigation and concluded that there was not sufficient evidence available to confirm or deny Plaintiff's claim of sexual abuse. [Id.] Specifically, Ayers noted that Plaintiff claimed that the assaults began in September of 2008 but he did not report the incidents until April of 2009; that there was no inmate housed at SCI Albion at that time with the last name of King, who Plaintiff claimed had been his cellmate at the time; that there was no physical evidence such as soiled clothing available; that processing videos from two separate institutions show Plaintiff clearly responding

"No" to inquiries about sexual abuse by another inmate; and that in telephone conversations with his wife they are calmly discussing contacting the Pennsylvania Law Project which does pro bono work and how Plaintiff thinks the State would settle for a substantial amount of money to keep his alleged assaults out of the media. [ECF No. 47-2: p. 13]. Ayers also noted that there was no basis for filing criminal charges because Plaintiff was unable to identify his assailant; Ayers, however, had advised Plaintiff during his interview with him that he could contact the Pennsylvania State Police ("PSP") if Plaintiff wished. [ECF No. 47-2: p. 5, ¶ 13].

Indeed, Plaintiff has alleged that in early April of 2009 he had his wife call the Sexual Assault Hotline on his behalf and that she subsequently told Plaintiff to write to Trooper Claypoole, which Plaintiff did on at least two occasions. [ECF No. 4: pp. 18, 19, ¶¶ 118, 124, 127]. Plaintiff also contends, however, that Ayer's represented to him during their initial meeting on April 6, 2009, that someone from the PSP would come to talk to Plaintiff and that he consequently waited for someone from the PSP to contact him. [ECF No. 4: p. 18, ¶ 120].

Ayers, it appears, met with Plaintiff again on October 14, 2009, and, on that same date, provided Trooper Dietz with information regarding Plaintiff's allegations of sexual assault. [ECF No. 47-2: p. 5, ¶ 14; p. 25].

In response to a letter dated December 16, 2009, from the DOC's Office of Professional Responsibility ("OPR") regarding a complaint submitted by Plaintiff, Superintendent Harlow directed Ayers to meet with Plaintiff again. [ECF No. 47-2: p. 37; p. 5, ¶ 15]. That meeting apparently took place on December 28, 2009, at which time Plaintiff indicated that he already had contact information for the PSP. Plaintiff also informed Ayers that he had filed a grievance against Ayers, Harlow and Foust five days earlier because Plaintiff had not received responses to the Requests to Staff he allegedly submitted in April, May and June of 2009 asking why he had

not been seen by the PSP. [ECF No. 4: p. 19, ¶ 122; ECF No. 47-2: p. 5, ¶ 15; p. 25]. Ayers' notes, however, reflect that there was no record of any Requests to Staff having been submitted.

On December 29, 2009, Harlow issued a Memo addressed to Plaintiff, which was apparently forwarded to OPR, summarizing Plaintiff's allegations and the subsequent investigation conducted by Ayers. The Memo concludes stating that:

> [t]he findings of the investigation using all the available evidence provided, statements by the inmate, and information provided by SCI Albion, including in processing video tapes, were not sufficient to confirm that a sexual assault took place involving inmate Laughlin. There is also a definite period of time from when this alleged assault took place and the time it was reported, and it should be noted that the report originated from the inmate's wife and not from himself. It should be further added that inmate Plaintiff was not able to positively identify the inmate he claims perpetrated the sexual assault. At the conclusion of the investigation . . . inmate Laughlin was advised of his right to contact the [PSP] for further pursuit of this reported incident. Inmate Laughlin was further advised again by Lieutenant Ayers of his ability to contact the PSP on 12/28/2009, which he refused.

[ECF No. 47-2: p. 5, ¶ 16; p. 39].

On or about April 9, 2010, Ayers obtained another written statement from Plaintiff regarding the sexual assaults which Ayers then forwarded to the PSP. [ECF No. 47-2: pp. 5-6, ¶ 18; pp. 41-43].

On August 13, 2010, Ayers received a photo array from the PSP which he showed to Plaintiff. Plaintiff, however, was unable to identify anyone from the photo array as his assailant. [ECF No. 47-2: p. 6, ¶ 19; pp. 47-53].[3]

On August 15, 2010, Plaintiff submitted a Request to Staff, requesting a copy of the statement he had made regarding the photo array. [ECF No. 47-2: pp. 6-7, ¶ 22; pp. 55-56].

---

[3] Plaintiff had indicated that his assailant was nicknamed "Blackie" and was housed at SCI Albion in cell 4 on C/B Unit. [ECF No. 4: p. 23, ¶ 146; ECF No. 47-2: pp. 49, 53]. Although an investigation did not reveal anyone with that nickname on C/B Unit during the relevant time period, a photograph of the inmate housed in cell 4 was included in the photo array. [ECF No. 47-2: p. 6, ¶ 20; p. 47].

When no response was forthcoming, Plaintiff submitted a grievance complaining that his request had not been answered. [Id.] Plaintiff was provided with a copy of the statement on September 1, 2010, however, and the grievance was withdrawn. [Id.] Thereafter, Corrections Defendant Ayers had no further official contact with Plaintiff regarding Plaintiff's allegations of being sexually assaulted by another inmate while he was at SCI Albion. [ECF No. 47-2: p. 7, ¶ 23].

The record also shows that on January 5, 2010, Plaintiff received a misconduct for engaging in, or encouraging, group activity and for refusing to obey an order, having approached a Corrections Officer in the dining hall in a loud and aggressive manner complaining about the portion size of his breakfast cake. [ECF No. 47-1: p. 33]. During the incident, which took place in front of approximately 230 other inmates, Plaintiff refused several direct orders to lower his voice and to exit the dining hall. [Id. at p. 35]. The misconduct, however, was dismissed without prejudice at a hearing held the next day and does not appear to have been refiled. [ECF No. 4: p. 21, ¶ 136].

Plaintiff filed the instant Complaint ("the Complaint") on September 2, 2010, bringing claims against Ms. Peck, the Cumberland County prosecutor; Detective David Smith; Attorney Kirk Henderson; Rod Shower; Emeka Ibemere; Susan Senchak; Shannon Randall; Valerie Hiebner; Doug Petroff; C.O. West; Lt. Ayers; Superintendent Harlow; and Lt. Yoman. [ECF No. 4]. Defendants Peck and Smith were dismissed from the case pursuant to a Motion to Dismiss submitted on their behalf, [ECF Nos. 20, 33], and Plaintiff voluntarily withdrew his claims against Defendants Shower, Petroff, West, Harlow and Yoman on July 11, 2012. [ECF Nos. 49; 7/16/2012 Text Order]. As such, Defendants Ibemere, Senchak, Randall, Hiebner and Ayers are the only defendants remaining in the case.[4]

---

[4] It appears from the Docket Sheet that Defendant Kirk Henderson was never served with the Complaint. See [ECF No. 8].

The Corrections Defendants filed a Motion for Summary Judgment on June 15, 2012, [ECF No. 44], to which Plaintiff responded on October 10, 2012. [ECF Nos. 59-61]. As such, the Motion is now ripe for review.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment**. A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> *      *      *
>
> **(c) Procedures**.
>
> **(1) *Supporting Factual Positions***. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(a), (c)(1)(A)-(B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007), *quoting* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007), *citing* Liberty Lobby, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322-23 ("[a] genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof").

> "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

Scott v. Harris, 550 U.S. 372, 380 (2007), *quoting* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, 242 F.3d 437, 446 (3d Cir. 2001); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## III.  DISCUSSION

Plaintiff does not specifically mention the Civil Rights Act, 42 U.S.C. § 1983, in his Complaint. Because, however, Plaintiff is apparently seeking to vindicate his constitutional rights and he does not have a cause of action directly under the Constitution, the Court shall construe his Complaint as one invoking the Court's jurisdiction pursuant to 42 U.S.C. § 1983

("Section 1983").  See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir. 2001) ("a litigant complaining of a violation of a constitutional right does not have a direct cause of action under the United States Constitution but must utilize 42 U.S.C. § 1983"); Wilson v. Moreau, 440 F. Supp. 2d 81, 92 (D.R.I. 2006), aff'd, 492 F.3d 50 (1st Cir. 2007).  See also Sowemimo v. Thomas, 2009 WL 3806737, at *4 (W.D. Pa. Nov. 13, 2009).

Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights: privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  "Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws.  It does not, by its own terms, create substantive rights."  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006), citing Baker v. McCollan, 443 U.S. 137, 145 n. 3 (1979) (footnote omitted).  Thus, in order to state a claim for relief under Section 1983, the plaintiff must allege facts from which it could be inferred that "the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States."  Id. at 423.

A liberal reading of the instant Complaint suggests that Plaintiff purports to bring claims for failure to protect in violation of his rights provided by the Eighth Amendment against Defendants Randall, Ibemere, Senchak and Hiebner, and arguably a First Amendment retaliation claim against Defendant Ayers.

### A.     Eighth Amendment Failure to Protect Claim

Plaintiff alleges that because Ibemere, Senchak, Hiebner and Randall were aware of the "snitch letters" he received while he was housed at SCI Albion, they had a duty to protect him and that their failure to do so resulted in his being physically harassed and sexually assaulted.

It is well established that included within the Eighth Amendment's ambit is a duty upon prison officials to "protect prisoners from violence at the hands of other prisoners," and that the prison official's conduct is measured against the well-known standard of "deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 833 (1994). See Jones v. Day, 2007 WL 30195, at *3 (W.D. Pa. Jan. 4, 2007). Deliberate indifference requires consciousness of a risk; that is, the official must be "subjectively aware of the risk." Farmer v. Brennan, 511 U.S. at 833-847. Thus, in order to succeed on a failure to protect claim under the Eighth Amendment, a prisoner must show that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists;" (3) the defendant actually drew this inference; and (4) the defendant deliberately disregarded the apparent risk. Id. at 834-37. See Jones v. Day, 2007 WL 30195, at *3 ("[i]t is not an objective test for deliberate indifference; rather, the court must look to what the prison official actually knew, rather than what a reasonable official in his position should have known"). See also Jones v. Beard, 145 F. App'x 743, 745 (3d Cir. 2005); Schaffer v. Wilson, 2007 WL 589023, at **3-4 (W.D. Pa. Feb. 20, 2007). Plaintiff has failed to meet this burden.

With respect to Defendant Randall, Plaintiff has alleged in the Complaint only that he was called into Randall's office on January 7, 2008, in order to speak with the prosecutor from Cumberland County on the telephone about the information he had regarding Comer. [ECF No.

4: p. 4, ¶ 2]. Plaintiff has not alleged any facts or pointed to any evidence from which it could be inferred that he was at a risk of harm at that time much less that Randall was aware of facts from which the inference could be drawn or that she had actually drawn the inference.[5] Indeed, the record shows Randall was a counselor on C/A Unit where Plaintiff was housed from August of 2007, until January 16, 2008, when he was transported to Cumberland County. [ECF No. 47-1: p. 3]. When Plaintiff returned, on February 7, 2008, he was initially assigned to J-Block and then to C/B Unit. As such Plaintiff had no further contact with Randall after January 16, 2008. [ECF No. 47-1: p. 40, ¶¶ 8, 9]. The earliest Plaintiff claims to have been harassed, however, was on February 7, 2008, when he returned to his cell and his cell mate said he heard Plaintiff was a snitch and that he didn't like a snitch. [ECF No. 4: pp. 5, 6, ¶¶ 9, 15]. Plaintiff also claims that after he received a "snitch type of paper" on February 10, 2008, and again on February 12, 2008, he started getting physically harassed. These incidents, however, all occurred after January 16, 2008, when Randall no longer had any contact with Plaintiff. The absence of any evidence that Randall was aware that Plaintiff was being harassed coupled with Randall's Declaration that Plaintiff never reported to her that he was being verbally harassed or physically assaulted by other inmates, precludes a finding that Randall failed to protect him in violation of the Eighth Amendment. [ECF No. 47-1: p. 40, ¶¶ 10-11].

Plaintiff's sole allegation in the Complaint against Defendant Senchak is that "[o]n 10-1-08 or 10-2-08 I told Ms. Senchak the unit manager about the [snitch] letters, name calling and *kinda of the assault* she told me to grow up this is prison Laughlin so just get over it." [ECF No. 4: p. 15, ¶ 100 (emphasis added)]. Plaintiff, however, has not alleged precisely what was

---

[5] Indeed, Plaintiff has not provided any evidence to support his claims at all. Rather, in his filings submitted in opposition to the Motion, Plaintiff merely reiterates the allegations in the Complaint, which are just that -- allegations -- and do not serve as evidence. [ECF Nos. 59-61]. Moreover, despite the Correction Defendants' repeated references to the insufficient facts in the Complaint, Plaintiff has not made any additional assertions to support his claims. [Id.]

contained in the "snitch letters" or what precisely he told Senchak about them. Nor has Plaintiff provided the Court with copies of the letters or any other evidence to suggest that the letters provided Senchak with facts from which she could infer that a substantial risk of serious harm to Plaintiff existed. Moreover, even if it could be construed from the allegations in the Complaint that such an inference could be drawn, Plaintiff has not provided any evidence from which a reasonable jury could conclude that Senchak actually drew the inference or that she subsequently chose to ignore it.

Notably, Plaintiff does not allege, nor has he provided any evidence to support a finding, that he told Senchak he had been repeatedly pushed, slapped, kicked, punched, elbowed, tripped or that he had been sexually assaulted. Plaintiff's lack of specificity coupled with his later allegation in the Complaint that he "never said anything until 1-6-09" when he filed a grievance about the sexual assaults precludes a finding that Senchak was aware that Plaintiff had been subjected to anything more than name calling. [ECF No. 4: pp. 17, 18, ¶¶ 113, 114].

Similarly, Defendant Ibemere is named in only one paragraph in the Complaint. There, Plaintiff alleges that on February 25, 2008, he showed Ibemere "the snitching letter" and was told "don't worry and he will see security come back in a few days to see him." [ECF No. 4: p. 7, ¶ 24]. Like with Senchak, however, Plaintiff has not alleged any facts or provided any evidence regarding the contents of "the snitch letter" or the nature of his conversation with Ibemere about the letter. It therefore would be purely speculative to find that "the snitch letter" Plaintiff showed to Ibemere placed Ibemere on notice that a substantial risk of serious harm to Plaintiff existed or that Ibemere consciously disregarded that risk. Indeed, the only evidence of record relevant to Plaintiff's allegations against Ibemere is Ibemere's Declaration in which he

attests to the fact that Plaintiff never showed him any such letters.  [ECF No. 47-1: pp. 51-52, ¶ 9].[6]

Finally, although Plaintiff purports to bring a claim of failure to protect against Defendant Hiebner he has not alleged or provided any evidence from which it could be concluded that Hiebner was aware of facts from which a substantial risk of serious harm to Plaintiff could be inferred, that she actually drew the inference or that she ignored it.

To the contrary, the evidence of record shows that although Plaintiff would tell Hiebner from time to time that he was concerned about how other inmates would treat him because he testified against Comer, his concerns were about verbal harassment rather than physical assaults.  [ECF No. 47-1: pp. 55-56, ¶¶ 5, 8].  More specifically, Hiebner has stated that Plaintiff never reported to her that he had been physically or sexually assaulted or that he had shown her any of the "snitch letters" he purportedly received.   [Id. at p. 56, ¶¶ 8-10].

Further, even if the Court were to consider the allegations in the Complaint as evidence of Plaintiff's claim that Hiebner failed to protect him, Hiebner would still be entitled to summary judgment.  Although Plaintiff alleges in the Complaint that he showed Hiebner some of the "snitching letters" he received, Plaintiff has again failed to indicate what precisely was contained in the letters.  As such, no reasonable jury could conclude that the letters provided Hiebner sufficient facts from which a substantial risk of serious harm could be inferred either.  [Id. at p. 13, ¶ 89].

---

[6] It should be noted here that Plaintiff does not allege that he told Ibemere that he had been verbally, physically or sexually assaulted and has certainly not provided any evidence to support such a claim.  His failure to do so, coupled with Ibemere's representation that Plaintiff never reported any such assaults to him, precludes a finding that Ibemere had was aware of facts from which a substantial risk of serious harm could be inferred.  [ECF No. 47-1: p. 51, ¶¶ 8, 10].  Moreover, Ibemere has attested to the fact that he was reassigned from C/B Unit, where Plaintiff was housed, to A/B Unit on July 14, 2008, and had no further contact or interaction with Plaintiff after that time.  [ECF No. 47-1: p. 51, ¶ 4].  According to Plaintiff, however, the first sexual assault did not occur until September 13, 2008.  As such, Plaintiff would not have had the opportunity to tell Ibemere about the sexual assaults.

Moreover, Plaintiff has alleged that when he told Hiebner on August 21, 2008, that he was being harassed, slapped, punched and threatened, her response was "don't worry about it. it will stop soon and blow over you know guts like talk and sometimes act big." [ECF No. 4: p. 12, ¶¶ 83-84]. Although these "facts" could arguably be said to provide Hiebner with sufficient information from which a substantial risk of harm could be inferred, it is clear from her response that Hiebner did not draw the inference.

Plaintiff also alleges that on September 18, 2008, he "*some what* told [Hiebner] about all the stuff [that] happened to [him]." [ECF No. 4: p. 14, ¶ 96]. What Plaintiff does not state is that he specifically told her about the sexual assault that allegedly occurred only five days earlier. In fact, Plaintiff has alleged in the Complaint that he did not tell anyone about the sexual assaults until January 6, 2009, [ECF No. 4: p. 17, ¶ 113], and the Corrections Defendants have provided evidence that Plaintiff did not tell anyone about the assaults until he was transferred to SCI Mercer on March 9, 2009. [ECF No. 47-2: p. 43]. Hiebner, therefore, cannot be deemed to have been aware of facts from which she could have inferred that there was a substantial risk of serious harm to Plaintiff in this regard. Coupled with Hiebner's declaration that Plaintiff only told her about his concerns of verbal harassment because he testified against Comer, Plaintiff is unable to succeed on an Eighth Amendment failure to protect claim. See Davis v. Williams, 2009 WL 4598329, at *3 (3rd Cir. 2009) (Prison officials' general knowledge that the assailant inmate displayed hostility in the past to the inmate assaulted "does not reflect that [prison officials] knew of and disregarded a substantial risk of serious harm" to the inmate assaulted).

It bears repeating at this juncture that Plaintiff's allegations that he was sexually assaulted in his cell at SCI Albion on September 13, 2008, September 27, 2008, and October 18, 2008, are refuted by his own statements. As previously discussed, Plaintiff was specifically asked whether

he had been sexually assaulted by another inmate on four different occasions between October 23, 2008, and March 25, 2009, and each time he replied "No." [ECF No. 47-1: pp. 11, 29, 31; ECF No. 47-2: pp. 3-4, ¶¶ 7, 8].

In addition, Plaintiff's medical records reflect that, although he was seen on a number of occasions by the medical staff at SCI Albion between June of 2007 and October of 2008, he never once mentioned that he had been assaulted or victimized by other inmates. Nor was Plaintiff ever treated for any injury as a result of the physical abuse he to which he claims he was subjected. [ECF No. 47-1: pp. 13-22]. Thus, not only is Plaintiff unable to sustain his failure to protect claims against Defendants Randall, Senchak, Ibemere and Hiebner, but Plaintiff's allegations of physical assaults underlying those claims are belied by the record.

### B. First Amendment Retaliation Claim

Although not entirely clear from the Complaint, Plaintiff has arguably asserted a claim of retaliation against Defendant Ayers.[7]

It is well settled that retaliation for the exercise of a constitutionally protected right may violate the protections of the First Amendment, which is actionable under Section 1983. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir. 1990). Merely alleging the fact of retaliation, however, is insufficient. Rather, to prevail on a retaliation claim, a plaintiff must show: (1) that he engaged in constitutionally protected conduct; (2) that he was subjected to an adverse action sufficient to deter a person of ordinary firmness from exercising his rights; and (3) that the protected activity was a substantial motivating factor in the

---

[7] Plaintiff has not brought specific claims against any specific Defendant. Rather, where asked "What federal law do you claim was violated?," Plaintiff general lists "sexual assault, assault, fail-to-protect, deliberate indifference, threatening retaliation, cover-up, and mental health." [ECF No. 4: p. 3, ¶ III]. Plaintiff then sets forth a lengthy narrative of the events that purportedly provide the basis for his claims. Defendant Ayers, however, is employed at SCI Mercer and not at SCI Albion where the alleged assaults occurred and did not learn of the alleged assaults until Plaintiff was subsequently transferred to SCI Mercer in March of 2009. Thus, Plaintiff's claims against Ayers, if any can be perceived, are necessarily limited to "threatened retaliation" and "cover-up."

decision to take the adverse action. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997). With this standard in mind, it is apparent that Plaintiff is unable to sustain a claim of retaliation against Defendant Ayers.

First, it is not entirely clear from the Complaint what protected activity Plaintiff claims he engaged in that precipitated Ayers alleged retaliatory conduct. Although Plaintiff has alleged that he filed a grievance against Ayers, he did not do so until December 23, 2009, and has not alleged any facts to suggest that Ayers took any action against him after that date. In fact, the only action taken against Plaintiff that could potentially qualify as an adverse action is that a misconduct was filed against Plaintiff on January 5, 2010. [ECF No. 4: p. 20, ¶ 133]. It appears from the Complaint, however, that Ayers had nothing to do with the misconduct. Plaintiff not only makes no reference to Ayers relative to the misconduct but has alleged that the "report" was made by Captain Zetwo and that he was subsequently threatened by Lt. Yoman about making any more trouble. [ECF No. 4: p. 21, ¶¶ 134, 137]. Plaintiff has not offered any evidence to the contrary and, thus, the misconduct filed against Plaintiff does not suffice to support a claim that Ayers retaliated against him.

Further, to the extent that Plaintiff complains that Ayers delayed contacting the PSP on Plaintiff's behalf, encouraged Plaintiff to abandon his complaints, and/or threatened to arrest Plaintiff for filing a false charge, such conduct does not rise to the level of an "adverse action" for purposes of a First Amendment retaliation claim. Actions deemed sufficiently adverse to sustain such a claim in the prison context are those such as being placed in disciplinary confinement or administrative segregation; denied parole; transferred to an institution whose distance made regular family visits impossible; suffering some sort of financial penalty; or being

severely limited access to the commissary, library, recreation, and rehabilitative programs. See Dunbar v. Barone, 487 F. App'x 721, 723 (3d Cir. 2012), *citing* Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir.2003); Rauser v. Horn, 241 F.3d at 333; Allah v. Seiverling, 229 F.3d 220, 225–26 (3d Cir. 2000). Conversely, verbal threats have been found insufficiently adverse to support a retaliation claim. Id.

Finally, the Court reiterates that according to Plaintiff's allegations in the Complaint, Ayers delay in contacting the PSP, his encouraging Plaintiff to abandon his claims of sexual assault and his alleged threat to arrest Plaintiff for filing a false charge all took place before Plaintiff filed the grievance against Ayers on December 23, 2009. [ECF No. 4: pp. 18- 20, ¶¶ 122-128]. Because any adverse action taken by Ayers predated Plaintiff's grievance, Ayers could not have been acting in response to Plaintiff having engaged in protected activity. Thus, to the extent Plaintiff intended to bring a First Amendment retaliation claim against Ayers, Ayers is entitled to summary judgment.

## IV.     CONCLUSION

Although this Court takes seriously allegations of physical assault and sexual assaults on inmates, Plaintiff has failed to point to any evidence of record from which a reasonable fact finder could find in his favor. Thus, for the foregoing reasons, the Motion for Summary Judgment submitted on behalf of the Corrections Defendants [ECF No. 44] will be granted. An appropriate order will follow.

/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

Dated: 25 March, 2013

cc:     Daniel Laughlin
        GR-6308
        SCI Mercer
        801 Butler Pike
        Mercer, PA 16137

        All counsel of record via CM/ECF